2008 OK CR 11

**Luis Maurico OCHOA and Gregorio Robles, Petitioners**

v.

**The Honorable Jerry D. BASS and John Whetsel, Sheriff for Oklahoma County, Respondents.**

No. HC–2007–1120.

Court of Criminal Appeals of Oklahoma.

March 12, 2008.

Joan L. Lopez, Oklahoma City, OK, Attorney for Defendants at trial.

Jimmy Harmon and Matt Dillon, Assistant District Attorneys, Oklahoma City, OK, Attorneys for State of Oklahoma at trial.

Joan L. Lopez and Michael S. Johnson, Oklahoma City, OK, Attorneys for Petitioners on appeal.

David M. Brockman, First Assistant District Attorney, Norman, OK, Attorney for Respondent, Jerry D. Bass, District Judge on appeal.

David W. Prater, District Attorney, John M. Jacobsen, Assistant District Attorney, Oklahoma City, OK, Attorneys for Respondent, John Whetsel, Sheriff on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Sandra D. Rinehart, Assistant Attorney General, Oklahoma City, OK, Attorneys for Amicus Curiae, State of Oklahoma on appeal.

*OPINION*

CHAPEL, Judge.

¶ 1 Petitioners, Luis Maurico Ochoa and Gregorio Robles, through counsel, have made application to this Court for writs of habeas corpus and prohibition in connection with commitment orders issued by Respondent, the Honorable Jerry D. Bass, District Judge, in Oklahoma County District Court, Case Nos. CF–2007–1173 and CF–2007–2987. Both the named Respondents have filed response briefs, the Oklahoma Attorney General (by leave of this Court) has filed a brief as *amicus curiae*, and counsel for Petitioners have filed a reply brief. We commend all counsel on their thorough and well-researched briefs, prepared on short notice in order that Petitioners' habeas claims could be speedily addressed.

¶ 2 On April 20, 2007, pursuant to a plea agreement, Petitioner Ochoa pled guilty to two counts of Second Degree Rape in CF–2007–1173. The District Court accepted Ochoa's pleas but delayed sentencing pending Ochoa's completion of the Oklahoma Department of Corrections' Regimented Inmate Discipline Program (RID). Ochoa successfully completed the RID program, and appeared before Judge Bass on November 9, 2007. Judge Bass sentenced him to concurrent terms of five (5) years imprisonment on each of the two counts. In accordance with the plea agreement, Judge Bass suspended execution of these sentences under terms of probation.

¶ 3 Also appearing on Judge Bass' docket on November 9, 2007, in a case unrelated to that of Ochoa's, was Petitioner Robles. Robles appeared for the purpose of a plea and sentencing in CF–2007–2987. Upon pleading guilty to Possession of a Controlled Dangerous Substance, Cocaine (Count 1), Domestic Assault and Battery (Count 2), and Assault and Battery (Count 3), Judge Bass, in accordance with a plea agreement, deferred sentencing for five (5) years on Count 1, imposed

sentences of one (1) year in jail on Count 2 and ninety (90) days in jail on Count 3, and suspended execution of both jail terms under terms of probation.

¶ 4 Separate attorneys represented Petitioners at sentencing, and Spanish-speaking interpreters aided in the proceedings. At some point during the proceedings, Judge Bass questioned Petitioners about their legal presence within the country. It is not clear from the record whether this occurred before or after each Petitioner was sentenced. As a result of that questioning Judge Bass, *sua sponte*, entered orders committing the custody of each Petitioner to the county sheriff. Ms. Lopez, an attorney, was present in the courtroom during Petitioners' sentencing proceedings and overheard Judge Bass questioning Petitioners and witnessed their commitment to custody. Believing these commitment proceedings to be unlawful, Ms. Lopez asked for leave to intervene and for an opportunity to speak with Petitioners and represent them concerning their immigration matters.[1] Ms. Lopez asked to make a record, visited with Petitioners to ascertain their desire for her representation, and placed Petitioners' formal objections to the commitment orders upon the record.

¶ 5 At that record hearing, Judge Bass gave the following summary of the purpose and nature of his commitment orders: "But anyway under House Bill 1804, which came into effect on November 1st, I took both of these people into custody as being illegal aliens and charged the Oklahoma County Sheriff to contact whoever 1804 says to contact."

¶ 6 House Bill 1804 is a recent piece of legislation entitled the "Oklahoma Taxpayer and Citizen Protection Act of 2007." 2007 Okla. Sess. Laws ch. 112, § 1, at 546. House Bill 1804's preamble states that it is designed "to discourage illegal immigration by requiring all agencies within this state to fully cooperate with federal immigration authori-

---

1. It is unclear from the record whether either of the attorneys who had represented the respective Petitioners in their criminal cases remained present within the courtroom when Ms. Lopez intervened on Petitioners' behalf. The parties to this action, however, agree that Petitioners' immigra-

tion issues present a legal matter distinct from their criminal cases, and thus present a matter in which Ms. Lopez could properly intercede on behalf of Petitioners, despite their representation by other counsel at sentencing.

ties in the enforcement of federal immigration laws." 2007 Okla. Sess. Laws ch. 112, § 2, at 546. Although he referenced House Bill 1804, Judge Bass did not identify which particular provision of that act he was relying upon as the basis for his custody orders. After hearing Petitioners' objections to his commitment orders, he declined to vacate them, and the current writ proceedings ensued.

¶ 7 On the same day Petitioners filed their writ applications with this Court, the Bureau of Immigration and Customs Enforcement (ICE) of the Department of Homeland Security filed an "Immigration Detainer—Notice of Action" with Sheriff Whetsel's office. According to the information presented to this Court, ICE did not assume custody of either Petitioner or otherwise act upon these detainers, and the forty-eight (48) hour period for it to do so lapsed.[2] Despite such circumstances, Sheriff Whetsel refused to release Petitioners due solely to Judge Bass's detention orders.

¶ 8 At the hearing before Judge Bass, Ms. Lopez raised the following three objections to his orders: (1) immigration questions were asked by Judge Bass without Petitioners having received *Miranda* warnings; (2) Section 5 of House Bill 1804 could not be construed as applying to Petitioners; and (3) House Bill 1804 "is preempted entirely by the Immigration Nationalization and Services Act of 1986." In their writ application, Petitioners make the additional claim that House Bill 1804 violates the Supremacy Clause of the United States Constitution. Petitioners now ask that this Court issue a writ of prohibition to Judge Bass prohibiting him from enforcing House Bill 1804 against them.

Petitioners further ask that a writ of habeas corpus issue to Sheriff Whetsel ordering the release of Petitioners from his custody.

■ ¶ 9 Petitioners challenge the constitutionality of House Bill 1804. Although this legislation was obviously the reason Judge Bass questioned Petitioners about their presence within the United States and the reason he subsequently ordered their commitment to the county sheriff, nothing within House Bill 1804 authorized or required Judge Bass to take that action. Consequently, Respondents cannot rely on House Bill 1804 as providing a legal basis for issuance of the commitment orders or as any basis for confinement of Petitioners under those orders. As House Bill 1804 does not authorize these commitment orders, Petitioners' cases do not turn upon whether that legislation is or is not constitutional, and Respondents must look elsewhere for their legal authority to confine Petitioners.

■ ¶ 10 An original action before this Court for a writ of habeas corpus requires a petitioner to establish that he is unlawfully confined and entitled to immediate release.[3] An original action for a writ of prohibition requires a petitioner to establish, among other things, that a court has exercised its power in a fashion unauthorized by law.[4] Having found that House Bill 1804 does not authorize Petitioners' commitment to the sheriff's custody, it must be determined if other lawful authority exists outside that legislation that will authorize the confinement orders imposed.

■ ¶ 11 We assume for purposes of this discussion that Judge Bass questioned the

---

2. *See* 8 C.F.R. § 287.7(d) (2007) ("Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department."). The detainers filed by ICE specifically reference this regulation, and they do not ask the sheriff to hold Petitioners for any other reason than "to provide adequate time for ICE to assume custody of the alien."

3. *See* Rule 10.6(C)(1), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App.

(2008) ("Petitioner has the burden of establishing confinement is unlawful."); *Berryhill v. State*, 2002 OK CR 7, ¶ 7, 43 P.3d 410, 411 ("For a writ of habeas corpus Petitioner must establish that his confinement is unlawful and that he is entitled to immediate release.").

4. *See Rule* 10.6(A) ("Petitioner has the burden of establishing (1) a court, officer or person has or is about to exercise judicial or quasi-judicial power; (2) the exercise of said power is unauthorized by law; and (3) the exercise of said power will result in injury for which there is no other adequate remedy.").

Petitioners before sentencing was pronounced. Under 22 O.S.2001, § 201, a district court judge may command the arrest of a person when a "public offense" is committed in his presence.[5] Accordingly, if circumstances were such, before Petitioners were sentenced in these cases, to give Judge Bass probable cause to believe Petitioners were within the country illegally, in an ongoing violation of federal law, he could lawfully order the county sheriff to take custody of Petitioners.[6]

¶ 12 Questioning a defendant's legal status within the country seems to us a legitimate inquiry for a judge who is deciding the terms of sentence to impose.[7] If the defendant is an undocumented alien and is released on probation into the community, he becomes subject to deportation. That contingency would obviously weigh heavily on a sentencing judge's decision about whether a defendant should be released on probation.[8]

During sentencing proceedings, trial courts take into consideration a variety of circumstances that may bear on the defendant's suitability for release into the community and influence the sentence ultimately imposed. In those instances where the sentencing judge has discretion in what sentence will be imposed, citizenship status is a circumstance that may affect the sentencing decision and is a legitimate area of concern about which the trial judge has authority to inquire.

¶ 13 We emphasize the narrow scope of our conclusion. Resting on the facts of the cases presented to us, we find only that the trial court had legal authority to question these defendants regarding their immigration status during the course of this sentencing hearing. We do not decide whether the trial court can or should ask such questions in any other stage of criminal proceedings prior to sentencing. We note, however, that should a trial court wish to

5. The cited statute states, "When a public offense is committed in the presence of a magistrate, he may, by a verbal or written order, command any person to arrest the offender, and may thereupon proceed as if the offender had been brought before him on a warrant of arrest." 22 O.S. 2001, § 201.

6. We recognize the argument that not every violation of federal immigration law is criminal in nature. See generally Immigration & Naturalization Serv. v. Lopez–Mendoza, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime."). Petitioners' reply brief claims there are many aliens who arrive in the United States legally, but whose legal status has expired, and that these individuals might only be subject to civil deportation proceedings and not criminal prosecution. A state-court magistrate is specifically permitted by federal statute to arrest and imprison persons for offenses against the United States "for trial before such court of the United States as by law has cognizance of the offense." 18 U.S.C. § 3041 (2000).

7. See Williams v. New York, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949) ("A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant— if not essential—to his selection of an appropri-

ate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."). In Oklahoma, presentence investigation reports include for the sentencing court's consideration "the offender's age, marital status, living arrangements, financial obligations, income, family history, education, prior juvenile and criminal records, associations with other persons convicted of a felony offense, social history, indications of a predisposition to violence or substance abuse, remorse or guilt about the offense or the victim's harm, job skills, and employment history." 22 O.S.Supp.2002, § 982(B). Immigration status differs in kind from these criteria but may, for similar reasons, be relevant to a sentencing decision.

8. See generally People v. Sanchez, 190 Cal.App.3d 224, 235 Cal.Rptr. 264, 267 (1987) ("Obviously, a convicted illegal alien felon, upon deportation, would be unable to comply with any terms and conditions of probation beyond the serving of any period of local incarceration imposed. These are legitimate factors for consideration by the trial judge in determining whether or not to grant probation in a particular case."); Ruvalcaba v. State, 122 Nev. 961, 143 P.3d 468, 470–71 (2006) (although a judge cannot base punishment on defendant's ethnicity, nationality, or citizenship, sentencing judge could consider "criminal defendant's status as an illegal alien when determining whether to grant the defendant's request for probation"; therefore, it was not error for trial judge to deny probation "because, as an illegal alien, [defendant] would likely be deported if he received probation and would thus ultimately avoid punishment").

question a defendant regarding immigration status before accepting a negotiated plea of guilty, the court should warn the defendant that he will be subject to such questioning.[9] We make no finding as to what obligation a defendant has to answer a trial judge's inquiries about citizenship nor do we decide whether or what *Miranda* warnings should precede any such inquiry. Finally, we emphasize that we are assuming Petitioners were questioned before sentence was pronounced. Our analysis, which revolves around the possible relevance of a defendant's immigration status to the trial court's sentencing decision, does not and cannot apply where a defendant has been sentenced before his citizenship status is questioned. After a defendant has been sentenced, any citizenship questions would be both impermissible and unnecessary because they could not be relevant to sentencing issues.

¶ 14 We also note that while a trial judge may ask questions about citizenship status at sentencing, a trial judge probably ought not to ask such questions.[10] Asking such questions may cause serious collateral problems in the proceedings. Moreover, even when a defendant admits he has no citizenship papers and has not registered as required by federal law, that does not necessarily mean a criminal offense is being committed. United States immigration laws are numerous and complex, and whether an undocumented alien has committed a federal criminal offense cannot and need not be decided by a state trial court during a state sentencing proceeding. Additionally, in this particular case, the trial court may have questioned defendants about a possible federal crime outside the presence of their attorneys, potentially creating a *Miranda* issue for the federal courts in the

event of subsequent prosecution. Just because a trial judge has the legal authority to ask about citizenship status at sentencing does not mean the judge should do so.

¶ 15 It is easy to foresee numerous collateral problems arising when a trial court asks about citizenship status during state sentencing proceedings. As was the case in Petitioners' matters, a defendant may be before the trial judge for sentencing in connection with a negotiated plea between the prosecution and defendant. On occasion, a prosecutor may offer a less-culpable defendant consideration, such as a lesser sentence or reduced charges, in exchange for that defendant's cooperation and testimony against a co-defendant. What might occur if part of the consideration is an agreement to ignore the defendant's citizenship status? A trial court that asks about citizenship upsets this arrangement. If the trial court orders the defendant taken into custody as happened here, the result may be deportation. Alternatively, faced with an inquiry about his citizenship, a defendant may decide to withdraw his promise to cooperate. Under either scenario, the State may lose its witness, and the State's other prosecution may be severely affected. A trial judge who asks about citizenship status at sentencing risks opening a can of worms that may cause complications in the case before it and jeopardize other cases.

¶ 16 Because the trial judge in this case apparently acted upon the belief that House Bill 1804 required him to do so, we are obligated to note that House Bill 1804 does and cannot impose such a duty upon the courts of this state. Establishing policy, including immigration policy, is the business

---

**9.** If a trial court intends to question a defendant before accepting a negotiated plea of guilty, in order to gain information which may influence the court's sentencing decision, then by definition the court has not accepted the negotiated plea. A defendant should be informed that the negotiated plea has not been accepted and his answers to the court's questions may determine his sentencing and may affect his status within the country.

**10.** We can envision other obligations to government and society that are arguably as important as an alien maintaining proper documentation of

residence. Payment of taxes and child support are two of them and a continued failure to timely perform those obligations can amount to a criminal violation. Recognizing, however, that they are not an investigative arm of the government and must generally remain neutral at every stage of the criminal proceedings, trial judges do not regularly ask defendants about these matters when determining a sentence. *See Shipman v. State*, 1982 OK CR 3, ¶ 13, 639 P.2d 1248, 1251 ("There is no question that a trial judge must remain neutral at every stage of the criminal proceedings.").

of the executive and legislative branches of government. Policy decisions are typically put into law by statute, administrative rule, or executive order. The executive branch is responsible for enforcing these laws. The judicial branch is left with the responsibility to resolve disputes concerning the enactment and enforcement of laws. Our legal system is an accusatorial system, not an inquisitorial one. A judge in our system is an independent, neutral arbiter of the disputes before him. A judge must not act as a prosecutor or investigator. Certainly a judge may ask questions which are relevant to the issue at hand, but a judge may not investigate, from the bench, any possible violations of law which are not the subject of the case or controversy before the court. No statute, administrative rule or executive order can constitutionally require or allow him to do so.[11] Instead, a judge who becomes aware of a possible violation of a law which is not the object of the case before him should refer that matter to the appropriate authorities.

¶ 17 Part of Petitioners' challenge to their commitment orders is their claim that Judge Bass questioned them concerning their alien status without having first given them *Miranda* warnings.[12] Petitioners also complain that although they were represented by counsel, Judge Bass questioned them about their immigration status without their attorneys being present.[13] Again, we assume that the questions were asked prior to sentence being pronounced. The primary issue before us is whether Judge Bass had the legal authority to question Petitioners at all, under the narrow facts presented. We have concluded that he did. Petitioners' complaints here might be relevant in a future federal proceeding. However, they do not affect Judge Bass's legal authority to question Petitioners. We therefore do not address the substantive legal issues raised by these claims.

¶ 18 Once Sheriff Whetsel notified ICE of Petitioners' custody, that agency had the option of taking Petitioners into its custody to prosecute them for federal immigration law violations and eventual deportation. By filing with Sheriff Whetsel the "Immigration Detainer—Notice of Action," ICE properly notified the sheriff it was considering that option. Once the forty-eight (48) hour period granted to ICE, by 8 C.F.R. § 287.7(d) (2007), for assumption of custody had lapsed without ICE taking any action on its detainers, the State no longer had authority to continue to hold Petitioners.

¶ 19 While it may seem inappropriate to release illegal immigrants and thereby indirectly permit them to continue in their illegal status, there is no independent state authority allowing Petitioners' continued state detention. If the federal government fails to apply federal law and take custody of Petitioners within the time limit set by federal regulations, then the state authorities must release Petitioners. Because Respondents have not shown they have any lawful authority for the continued state confinement of Petitioners, Ochoa and Robles are entitled to writs of habeas corpus commanding their release.

### *Summary*

¶ 20 When Petitioners appeared before the District Court, Judge Bass obtained probable cause to believe that each was unlawfully present within the United States in violation of federal civil or criminal law. He therefore had authority to commit Petitioners to the county sheriff's custody for notification of the Bureau of Immigration and Customs Enforcement (ICE) of the Department of Homeland Security. Once the Department

---

11. House Bill 1804 requires "all agencies within this state to fully cooperate with federal immigration authorities in the enforcement of federal immigration laws". However, the judiciary—Oklahoma's courts—are not "agencies" within the state, but instead constitute a separate branch of government.

12. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

13. Apparently no court reporter was present at the time Judge Bass questioned Petitioners about their legal presence within the country. There is no transcript of that portion of the proceedings. We assume for purposes of this question that counsel was not present.

failed to timely respond to that notification, or once (as in this case) it timely responded by lodging a detainer but neglected to assume custody of Petitioners within the time allowed by law, no further detention was warranted or authorized by law, absent any independent State ground for further detention.

¶ 21 Nothing within the provisions of House Bill 1804 provided an independent state ground for further detention under such circumstances. Moreover, Petitioners cannot show that Judge Bass has enforced any portion of House Bill 1804 against them, or that he is about to do so. That being so, Petitioners have not proven entitlement to a writ of prohibition against enforcement of House Bill 1804, and the constitutionality of that measure is not implicated by these proceedings. Nevertheless, Petitioners have shown that their ongoing confinement by Respondents is without any state authority; therefore, Ochoa and Robles are entitled to writs of habeas corpus commanding their immediate release from state custody.[14] Nothing within this order, however, shall restrict the District Court's continuing jurisdiction and authority over those probated sentences it imposed upon Petitioners.

### Decision

¶ 22 **IT IS THEREFORE THE ORDER OF THIS COURT** that original jurisdiction is assumed and the **WRIT OF PROHIBITION IS DENIED,** but the **WRITS OF HABEAS CORPUS ARE ISSUED,** and Petitioners, LUIS MAURICO OCHOA and GREGORIO ROBLES, are hereby **DISCHARGED** from further state confinement under the November 9, 2007, orders of detention.

C. JOHNSON, V.P.J. and LEWIS, J.: concur.

A. JOHNSON, J., concurs in results.

LUMPKIN, P.J., concurs in part/dissents in part.

14. On February 7, 2008, this Court entered an Interim Order in this case discharging Petitioners from further state confinement under the November 9, 2007, detention orders. We did so

LUMPKIN, Presiding Judge: Concur In Part/Dissent In Part.

¶ 1 I want to commend Judge Bass for doing what all judges are sworn to do, follow the law. At the time of his order he had before him the Petitioners, convicted felons, and probable cause to believe another "public offense" was being committed in his presence. Pursuant to 22 O.S.2001, § 201, Judge Bass rightfully inquired regarding the legality of Petitioners' presence in this country and once the illegality was established, his duty was to commit them to the custody of the Sheriff for further action. I agree there are no independent state grounds for the continued detention of Petitioners and the timeline under the federal statute has passed. I further agree with the Court's opinion that it seems "inappropriate to release illegal immigrants and thereby indirectly permit them to continue their illegal status". However, without authority to detain under either federal or state law, the Petitioners must be released. While the provisions of HB–1804, 22 O.S. Supp.2007, § 171.2, require an exercise of reasonable efforts to determine the citizenship status of persons charged with crimes, it does not set out a legal basis to detain. If the Court's opinion had concisely adjudicated these facts I would have simply concurred in the decision. However, I must take issue with its mistaken perspectives of the role of a judge, especially in the taking of pleas, some of the assumptions made, and the immigration policy analysis.

¶ 2 It must first be pointed out that 22 O.S.2001, § 201 is not restricted to that time prior to sentencing. The opinion takes the plain language of the statute and seeks to judicially amend its language to restrict its application. The language of the statute makes it clear that its dictates apply any time a public offense is committed in the presence of the judge. Secondly, a judge has a duty to inquire regarding any plea presented to the court, negotiated or not, and a defendant offering a plea is on notice to that

to prevent Petitioners' continued illegal detention while we considered the complex legal issues involved in this case.

fact. It is the judge's duty to ensure any plea meets the requirements of the law and the dictates of justice in a particular case, together with determining if the defendant offering the plea is eligible for the recommendation in a negotiated plea. The court should not allow any party to commit a fraud upon the court by withholding information regarding the qualifications of any defendant to receive a particular sentence. Third, citizenship status is important for the judge to ensure a defendant is afforded the rights under the Vienna Convention on Consular Rights prior to accepting a plea. Therefore, the Court's policy discussions in this opinion on the handling of pleas and the inquiries that are appropriate disregard the steps required in the actual taking of pleas in the District Courts. While the opinion makes a point that a judge must remain neutral, it seems overly concerned that a judge doing his or her job might undo a deal for the State. This seems inconsistent to me.

¶ 3 The opinion also overlooks the fact that a state-court magistrate is specifically permitted by federal statute to arrest and imprison persons for offenses against the United States "for trial before such court of the United States as by law has cognizance of the offense." 18 U.S.C. § 3041 (2000). This right also accrues to state officers for the investigation and arrest for immigration offenses. *See United States v. Vasquez–Alvarez,* 176 F.3d 1294, 1296 (10th Cir.1999). A very thorough discussion on the inherent authority of the states to arrest aliens for violating criminal provisions of the Immigration and Nationality Act and to also arrest for civil violations that render an alien deportable was set out by Kris W. Kobach in *The Quintessential Force Multiplier: The Inherent Authority of Local Police to Make Immigration Arrests,* 69 Alb. L.Rev. 179 (2005) (concluding that there has been no preemption of local police power to make immigration arrests and that Congress has repeatedly acted to preserve, support, and encourage local arrest authority). Therefore, the law supports the action by Judge Bass in this case.

¶ 4 The real problem in this case is that unlike Judge Bass, who did follow the law,

the federal government has failed in its duty to enforce the immigration laws of this country. While individual Border Patrol and INS officers do perform admirably within the limited scope of their ability, this failure to enforce the law reflects a gross dereliction of duty at all levels of our federal government. Our country is strengthened through the entry of *legal* immigrants into our society with their oaths of allegiance to our Constitution, laws, and way of life. This legal entry fulfills the motto on the Great Seal of the United States "*e pluribus unum*", i.e. "out of many, one". On the other hand, illegal immigrants make a mockery of the laws enacted to protect that way of life and if not checked have the potential to "Balkanize" the country. Too many factions in our society have tried to dilute the facts of the status of illegal immigrants by the semantic labeling of their unlawful entry and presence in our country as merely "undocumented aliens". I guess those same factions would label someone caught trafficking in drugs as an "undocumented pharmacist".

¶ 5 We can all agree that as citizens by birth or naturalization, those of us here legally are blessed to be in the greatest country in the world. It is natural that individuals living in countries that do not provide the same blessings, opportunities, and security would desire to migrate to the United States of America. That migration is welcomed if it is done legally. The failure of the federal government to enforce the law of the land has made a mockery of our immigration law and diminished the Rule of Law as a part of our national framework.

¶ 6 As previously stated, state authorities have the police power to make arrests for violation of immigration laws. When the federal government fails to follow the law, the states must fill that void. We cannot selectively decide we will enforce some laws and disregard others if we fulfill our oath of office and truly apply the Rule of Law.

A. JOHNSON, Judge, Concur in Results:

¶ 1 I concur with those portions of this opinion that find Judge Bass had authority to commit Petitioners to custody of the county sheriff for notification of Bureau of Immigra-

tion and Customs Enforcement (ICE) of the Department of Homeland Security. I also concur with the portions of the opinion finding that once the Department failed to timely respond to the sheriff's notification by assuming custody of Petitioners within the time allowed by federal law, no further detention was warranted by the law of this State. I therefore fully concur with the opinion to the extent it concludes that the Petitioners have shown that their ongoing confinement by the Respondents is without any state authority and that they are entitled to the writ of habeas corpus. Lastly, for the reasons stated by the majority, I agree that the Petitioners have failed to demonstrate an entitlement to a writ of prohibition.

¶2 I cannot agree, however, with those portions of the majority opinion that: (1) purport to address the propriety of a judge questioning a defendant about his or her citizenship status; (2) reach the sweeping constitutional conclusion by mere assertion that "[n]o statute, administrative rule or executive order can constitutionally require or allow" a judge to inquire from the bench, into any violations of law that are not the subject of the case or controversy before the court; and (3) comment on the wisdom of releasing aliens from state detention when it is not even clear that they would be held in detention by federal authorities while their immigration status is being adjudicated under federal law.

¶3 The necessary question presented for decision in this case is not under what circumstances a judge may question a defendant about his or her citizenship status, nor is it whether the courts of this State are "agencies" that may be constitutionally subjected to certain legislative enactments. The only question to be answered here, as in any habeas action, is simply whether the Petitioners' detention is lawful. Discussion of these other matters has no bearing on the legality of the Petitioners' detention, and therefore, in my view, constitutes dictum at best and an unconstitutional advisory opinion at worst.