### The STATE of Ohio, Appellee,

v.

**CHAVEZ–JUAREZ, Appellant.**

[Cite as *State v. Chavez–Juarez*, 185 Ohio App.3d 189, 2009-Ohio-6130.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 2009–CA–33.

Decided Nov. 20, 2009.

Michael F. Sheils, Springfield Prosecuting Attorney, and Christopher Hickey, Assistant Prosecuting Attorney, for appellee.

George A. Katchmer, for appellant.

FAIN, Judge.

{¶ 1} Appellant, Martin Chavez–Juarez, appeals from an order overruling his motion for contempt, which he filed against unnamed officers of the United States Bureau of Immigration and Customs Enforcement Agency ("ICE").

{¶ 2} Chavez–Juarez ("Chavez") contends that the trial court erred in denying his motion for contempt, because the ICE agents deprived him of due process of law, equal protection of the law, and his right, under the Seventh Amendment to the United States Constitution, to a public hearing by intentionally interfering with his right to appear personally in his traffic case. Chavez further contends that the trial court erred in denying the motion for contempt, because the ICE agents deprived him of his right to counsel, under the Sixth Amendment to the United States Constitution, by illegally removing him from the jurisdiction and giving no notice of his whereabouts. Finally, Chavez contends that the trial court erred in denying the motion for contempt, because the ICE agents deprived him of his residual rights under the Ninth Amendment to the United States Constitution.

{¶ 3} We conclude that the trial court could not adjudicate the validity of the federal detainer, because the area of immigration and naturalization is within the exclusive jurisdiction of the federal government. If Chavez wished to challenge his detention by federal authorities, the proper avenue would have been to file a petition in the federal courts, not a motion for contempt in the state court, which does not have the power to adjudicate federal immigration issues. Whether the federal government violated Chavez's rights during the immigration process is a matter for federal courts, not state courts, to adjudicate.

{¶ 4} We further conclude that even if the state court could assert jurisdiction over the matter, the trial court did not abuse its discretion in overruling the motion for contempt. Chavez failed to establish either a violation of the court order or that immigration agents knew of the court order and disobeyed it. Accordingly, the order of the trial court from which this appeal is taken is affirmed.

I

{¶ 5} In the early morning hours of Friday, October 24, 2008, Trooper Dingeman of the Ohio State Highway Patrol initiated a traffic stop after observing a driver (Chavez) commit numerous marked-lane violations. On approaching the vehicle, Dingeman observed that Chavez's eyes were glassy and bloodshot. Dingeman could also smell a strong odor of alcohol. Chavez had difficulty taking field-sobriety tests, however, because he had trouble understanding the directions. Dingeman placed Chavez under arrest for Operating a Vehicle under the Influence of Alcohol ("OVI"), and transported him to the Clark County Jail. A subsequent breath test produced a blood-alcohol reading of 0.153, in excess of the statutory limit.

{¶ 6} Chavez produced a valid North Carolina driver's license when he was stopped, but informed Dingeman that he was in the United States illegally. Chavez was booked into the Clark County Jail at 4:10 a.m., and the "hold" information indicates the existence of an immigration holder for Immigrations and Customs Enforcement.

{¶ 7} Chavez was ordered to appear in the Springfield Municipal Court for arraignment on October 24, 2008, and he was taken to court from the jail. Attorney George Katchmer entered an appearance and a plea of "not guilty" for Chavez at the time of the arraignment. On the same day, the trial court filed an order releasing Chavez on his own recognizance. The court also ordered the keeper of the jail to release Chavez. However, Chavez was not released as ordered.

{¶ 8} An affidavit filed by Chavez indicates that when he left the courtroom, a policeman guided him to a detention room and gave him a uniform. Although Chavez told the officer that the court had declared him to be free, the officer told him to keep his mouth shut. Chavez was taken back to the Clark County Jail.

{¶ 9} Chavez was held at the Clark County Jail on Saturday and Sunday and was then transferred to Columbus, Ohio, apparently in the custody of ICE. There is no indication of what, if any, type of administrative or judicial deportation proceedings occurred thereafter. Chavez's affidavit states that he was asked some questions about his parents and that he was transferred to Hamilton, Ohio,

with a group of other Mexicans. Approximately 13 days after his seizure by ICE, Chavez was transferred in handcuffs and shackles to an airport. ICE personnel removed the handcuffs and cut the laces from Chavez's shoes. Chavez and the other Mexicans were then placed on an airplane and were transported to Mexico.

{¶ 10} In the meantime, the Clark County Public Defender had also entered an appearance on Chavez's behalf. The municipal court set a pretrial hearing for November 13, 2008, but Chavez was not available for the pretrial. A pretrial-review form indicates that the prosecutor recommended that Chavez plead to the OVI charge and that the marked-lane violation be dismissed. The case was then set for a "not for trial" hearing, to be held on January 23, 2009.

{¶ 11} On the day before the scheduled hearing, Katchmer filed a motion for contempt against unnamed officers of ICE, Department of Homeland Security ("DHS"). In the motion, it was represented that ICE officers had removed Chavez from the Clark County Jail in contravention of the court's order and without the court's having relinquished jurisdiction. The motion additionally noted that Chavez had been deported from the United States, without legal justification, and without notice having been given to the court or counsel. Katchmer requested a hearing and a court order holding ICE and its agents in contempt. The motion was served on DHS through the Attorney General of the United States.

{¶ 12} DHS failed to file a response and did not appear at the contempt hearing, which took place in early March 2009. The trial court found it disconcerting that immigration officers had interfered with the disposition of cases, but did not feel that the officers' actions rose to the level of contempt. Accordingly, the court overruled the motion for contempt. The state then indicated that it would ask for the charges to be dismissed without prejudice in view of Chavez's unavailability. The trial court agreed and dismissed the charges without prejudice. Chavez appeals from the order overruling his motion for contempt.

## II

{¶ 13} Chavez's first assignment of error is as follows:

{¶ 14} "The court erred by denying the appellant's motion for civil contempt since the actions of the agents of Homeland Security deprived him of due process of law by illegally interfering with his right to appear personally in his traffic case."

{¶ 15} Under this assignment of error, Chavez contends that the trial court abused its discretion in denying the contempt motion. Chavez contends that the ICE agents should have been held in contempt, because their actions deprived

him, without due process, of the right to appear in person at his plea and disposition hearing.

{¶ 16} The state has moved to dismiss the appeal, based on three grounds: (1) there is no case or controversy, because the state dismissed the criminal charges against Chavez, (2) civil contempt is not a remedy, because the trial court never issued a court order to ICE, and (3) the trial court lacks jurisdiction over ICE, due to the federal government's implied preemptive jurisdiction over immigration issues.

{¶ 17} In responding to the motion to dismiss, Chavez contends that he is still in jeopardy, because he faces criminal charges if he returns to the jurisdiction. Chavez also notes that the court of appeals has jurisdiction to review decisions on contempt matters. And finally, Chavez argues that DHS does not have jurisdiction over state traffic or criminal matters and that even in felony cases, DHS cannot remove individuals until after they have completed their sentences.

A.   The Effect of the Dismissal of the Criminal Claims without Prejudice

{¶ 18} The state's first contention is that there is no case or controversy, because the criminal charges against Chavez were dismissed without prejudice. Crim.R. 48(A) provides: "The state may by leave of court and in open court file an entry of dismissal of an indictment, information, or complaint and the prosecution shall thereupon terminate." Crim.R. 48(A) dismissals are without prejudice,. unless "there is a deprivation of a defendant's constitutional or statutory rights, the violation of which would, in and of itself, bar further prosecution." (Citations omitted.) *State v. Jones*, Montgomery App. No. 22521, 2009-Ohio-1957, 2009 WL 1124457, at ¶ 13.

{¶ 19} Consistent with this rule, the trial court granted the state's request and dismissed the criminal complaint against Chavez without prejudice. In view of the dismissal, the state contends that Chavez's appeal is improper, because there is no longer a case or controversy.

{¶ 20} Typically, when a criminal complaint is dismissed, the defendant has suffered no adverse action, and may not appeal. " 'Appeals are not allowed for the purpose of settling abstract questions, but only to correct errors injuriously affecting the appellant.' " *Toledo v. Crenshaw*, Lucas App. No. L–02–1208, 2003-Ohio-306, 2003 WL 164799, at ¶ 3, quoting *State ex rel. Gabriel v. Youngstown* (1996), 75 Ohio St.3d 618, 619, 665 N.E.2d 209.

{¶ 21} In *Crenshaw*, the defendant had filed an answer and counterclaim to a criminal complaint, challenging the validity of the way in which the city of Toledo handles parking tickets. Id. at ¶ 1. After the municipal court dismissed the criminal complaint, the Sixth District Court of Appeals held that the defendant

lacked standing to appeal because he had not been injured, and any civil claim he possessed for inconvenience was not before the court. Id. at ¶ 4.

{¶ 22} Chavez argues that a case and controversy nonetheless exists in the case before us, because the trial court overruled his motion for contempt. Chavez claims that the trial court issued a ruling, and that he has sustained injury, because he was removed from the country and was unable to respond to the criminal charges. Morever, even though the charges were dismissed, Chavez points out that he will still be subject to prosecution if he returns to this jurisdiction.

{¶ 23} In *State ex rel. Corn v. Russo* (2001), 90 Ohio St.3d 551, 554–555, 740 N.E.2d 265, the Supreme Court of Ohio noted:

{¶ 24} "Contempt is defined in general terms as disobedience of a court order. ' "It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions.' " *Denovchek v. Trumbull Cty. Bd. of Commrs.* (1988), 36 Ohio St.3d 14, 15, 520 N.E.2d 1362, 1363–1364 quoting *Windham Bank v. Tomaszczyk* (1971), 27 Ohio St.2d 55, 56 O.O.2d 31, 271 N.E.2d 815, paragraph one of the syllabus. Contempt proceedings are often classified as *sui generis*, neither civil nor criminal. Id. However, most courts distinguish between civil and criminal contempt proceedings. The distinction is usually based on the purpose to be served by the sanction. Dan D. Dobbs, Contempt of Court: A Survey (1971), 56 Cornell L.Rev. 183, 235. Thus, in determining whether a contempt is civil or criminal, the pertinent test is 'what does the court primarily seek to accomplish by imposing sentence?' *Shillitani v. United States* (1966), 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622, 627.

{¶ 25} "Civil contempt sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order. Id. Criminal contempt sanctions, however, are punitive in nature and are designed to vindicate the authority of the court. *Denovchek v. Trumball Cty. Bd. of Commrs.*, 36 Ohio St.3d at 15, 520 N.E.2d [1362]. Thus, civil contempts are characterized as violations against the party for whose benefit the order was made, whereas criminal contempts are most often described as offenses against the dignity or process of the court."

{¶ 26} In *State ex rel. Corn*, 90 Ohio St.3d 551, 740 N.E.2d 265, the Supreme Court of Ohio also noted the well-established principle that "where the parties settle the underlying case that gave rise to the civil contempt sanction, the contempt proceeding is moot, since the case has come to an end." Id. at 555, 740 N.E.2d 265. However, the court also held that criminal contempt charges are separate and independent from the original action and that dismissal of the

underlying action does not deprive the common pleas court of jurisdiction to consider a criminal contempt charge. Id. at 556, 740 N.E.2d 265.

{¶ 27} The court additionally discussed the fact that a charge brought for civil contempt may change to a criminal contempt situation, where the purpose of the sanction is no longer restricted to an attempt to force compliance with a court order, but is intended "to vindicate the authority of the judge and to punish * * * [the alleged contemnors if the court finds] that their practices impeded the judicial process * * *." *State ex rel. Corn,* 90 Ohio St.3d at 556, 740 N.E.2d 265. Thus, in *State ex rel. Corn,* the Supreme Court of Ohio concluded that the matter had changed from civil to criminal contempt, because the focus had been altered from an attempt to force the relators to comply with discovery orders to an inquiry about whether the relators had systematically destroyed records to prevent opposing counsel and the court from inquiring into the relator's business practices. Id.

{¶ 28} In deciding whether criminal contempt proceedings could go forward, even though the underlying lawsuit had been dismissed, the Supreme Court of Ohio focused on federal cases in which collateral matters had survived dismissal of a case. The court observed:

{¶ 29} "In *Cooter & Gell v. Hartmarx Corp.* (1990), 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359, the United States Supreme Court decided a similar issue in the context of whether it could impose under Fed.R.Civ.P. 11 sanctions on a law firm after the firm had dismissed the complaint in an antitrust action. The law firm had argued, like the relators argue in this appeal, that the court had no jurisdiction to impose sanctions, since the lawsuit had been dismissed. The United States Supreme Court disagreed. The court ruled:

{¶ 30} " 'Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate. Such a determination may be made after the principal suit has been terminated.' " (Emphasis omitted.) *State ex rel Corn,* 90 Ohio St.3d at 556, 740 N.E.2d 265.

{¶ 31} The Supreme Court of Ohio decided to follow these federal authorities and allow collateral issues of criminal contempt to be considered, even when the underlying action is no longer pending. Id. This doctrine has subsequently been applied in a case involving civil contempt. See *Kahler v. Capehart,* Seneca App. No. 13–03–55, 2004-Ohio-2224, 2004 WL 937325, at ¶ 9, fn. 3 (observing that the trial court has inherent authority to consider the collateral issue of contempt for failure to obey a court order rendered before the action was dismissed, notwithstanding the trial court's characterization of the matter as civil contempt).

{¶ 32} In considering this issue, we first note that the trial court overruled the contempt motion prior to dismissing the case. The issue, therefore, is not whether the court had jurisdiction to consider a collateral matter after the action has been dismissed. Furthermore, the sanction involved in the case before us is more akin to criminal contempt than civil. When the motion was filed, Chavez had already been removed from the United States and was no longer in ICE's control. At that point, there was little possibility of obtaining compliance with the court order releasing Chavez on bond. However, a finding of contempt, if proper, could have vindicated the judge's authority to punish persons who had impeded the judicial process. *State ex rel. Corn,* 90 Ohio St.3d at 555–556, 740 N.E.2d 265. Chavez also requested at the contempt hearing that ICE be held in both civil and criminal contempt.

{¶ 33} Accordingly, we conclude that the dismissal of the underlying criminal case did not deprive the trial court, or this court, of jurisdiction to consider the contempt issue.

B. The Appropriateness of Civil Contempt as a Remedy

{¶ 34} As additional support for its motion to dismiss, the state contends that civil contempt is not an appropriate remedy, because the trial court never issued an order to ICE or DHS. We disagree that direct issuance of an order against a nonparty is a predicate for finding contempt.

{¶ 35} Common pleas courts have "both inherent and statutory power to punish contempts." *Burt v. Dodge* (1992), 65 Ohio St.3d 34, 35, 599 N.E.2d 693, citing *Zakany v. Zakany* (1984), 9 Ohio St.3d 192, 9 OBR 505, 459 N.E.2d 870. "Under the proper circumstances, courts can find nonparties guilty of contempt." *Scarnecchia v. Rebhan,* Mahoning App. No. 05 MA 213, 2006-Ohio-7053, 2006 WL 3849294, at ¶ 9.

{¶ 36} For example, in *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho* (1990), 52 Ohio St.3d 56, 556 N.E.2d 157, the Supreme Court of Ohio considered whether picketers who were not parties to an action between Planned Parenthood and certain anti-abortion groups could be held in contempt for violating terms of a preliminary injunction. The court concluded that the nonparties were bound by the terms of the injunction, because they were " 'persons in active concert or participation with [the parties to the action].' " Id. at 61, 556 N.E.2d 157. This was based on the theory that "[n]onparties are bound by an injunction to ensure 'that defendants [do] not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.' " Id. The nonparties must have had actual notice of the injunction, however, in order to be bound. Id.

{¶ 37} After reviewing the record, the Supreme Court of Ohio concluded that the picketers had actual knowledge of the injunction and that the trial court did not abuse its discretion in holding them in contempt. Id. See also *Citicasters Co. v. Stop 26–Riverbend, Inc.*, 147 Ohio App.3d 531, 2002-Ohio-2286, 771 N.E.2d 317, at ¶ 65–92 (holding attorney in contempt for failing to ensure client's compliance with a temporary restraining order), and *Adkins v. Hansen,* Ashland App. No. 01COA01437, 2002-Ohio-2676, 2002 WL 1070693 (noting that the trial court would have had jurisdiction for purposes of indirect civil contempt over a nonparty insurance company, to the extent that the insurance company represented the interests of the defendants in the action).

{¶ 38} Accordingly, we disagree with the proposition that ICE could not be held in contempt, absent a direct order from the court to ICE.

C.   Jurisdiction over ICE

{¶ 39} Before we turn to the issue of the trial court's alleged lack of jurisdiction over ICE, we will briefly outline the elements of contempt. Ohio courts have variously classified contempt as "criminal or civil, direct or indirect." *In re Carroll* (1985), 28 Ohio App.3d 6, 8, 28 OBR 15, 501 N.E.2d 1204.

{¶ 40} Direct contempt is "misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice," and it may be summarily punished. R.C. 2705.01. R.C. 2705.01, however, "merely restates the inherent power of a court to summarily punish contemptuous acts committed in the presence of the court." 28 Ohio App.3d at 8, 28 OBR 15, 501 N.E.2d 1204.

{¶ 41} "Indirect contempt, on the other hand, is conduct which takes place outside the presence of the court.  * * * The court is not usually aware of the indirect contemptuous act when it occurs. When the court is informed that an act of indirect contempt has taken place, the accused contemnor will be given notice and a hearing held on the charge." Id. at 8–9, 28 O.B.R. 15, 501 N.E.2d 1204.

{¶ 42} An important factor, however, is that "to show a contempt, it is necessary to establish a valid court order, knowledge of the order, and violation of it." *Arthur Young & Co. v. Kelly* (1990), 68 Ohio App.3d 287, 295, 588 N.E.2d 233. "In civil contempt, intent to violate the order need not be proved." Id. However, intent to violate the order is an essential element of criminal contempt. *Carroll,* 28 Ohio App.3d at 10, 28 OBR 15, 501 N.E.2d 1204.

{¶ 43} We have already concluded that the contempt proceedings in the case before us could be considered as criminal, rather than civil, because the alleged offense is one against the dignity or processes of the court. In addition, Chavez asked for both civil and criminal contempt sanctions. The alleged contempt in

this case is also indirect, because it would have been committed outside the trial court's presence.

{¶ 44} Turning to the jurisdictional issue, "[w]hether a trial court has subject matter and personal jurisdiction over a defendant is a question of law reviewed de novo." (Citations omitted.) *Advantage Bank v. Waldo Pub, L.L.C.*, Marion App. No. 9–08–67, 2009-Ohio-2816, 2009 WL 1664781, at ¶ 25. De novo review means "that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, at ¶ 16.

{¶ 45} The state contends that the trial court lacked jurisdiction over ICE, which operates under the authority of DHS, because the federal courts have implied preemptive jurisdiction over immigration issues. We agree. "Control over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere." (Citations omitted.) *Nyquist v. Mauclet* (1977), 432 U.S. 1, 10, 97 S.Ct. 2120, 2126, 53 L.Ed.2d 63. For example, in *Ricketts v. Palm Beach Cty. Sheriff* (Fla.App.2008), 985 So.2d 591, the appellant appealed from a denial of his habeas petition seeking relief "from the sheriff's policy of detaining arrestees subject to a federal immigration hold." Id. Although the appellant had been given a bond of $1,000 in state court, the sheriff refused to accept the bond, because appellant was subject to an immigration hold. The sheriff's office also refused to release information to the public defender's office about detainers. Id. The appellate court described the situation as follows:

{¶ 46} "Appellant sought habeas corpus relief. He claimed that he and others similarly situated were being illegally detained without any showing of probable cause or judicial oversight. At the hearing, Lieutenant Robert Manley, who supervises intake and release at the Palm Beach County Sheriff's Office, explained the relationship between the federal government and the sheriff's office with respect to ICE holds. When subjects arrive at the jail, federal agents from ICE place in the jail record a form I–247, which is considered a detainer. This document requires the recipient to detain an alien for forty-eight hours after the alien ceases to be in custody on state charges. If a form I–203 is filed, and the alien has been released from state custody, the alien continues to be held and is considered to be in federal custody pending deportation proceedings. At that time, the alien remains in jail as a federal detainee until ICE takes custody of the alien from the sheriff. The jail receives monetary consideration pursuant to a contract with the federal government for holding federal prisoners, which consideration begins to run after the detainee is booked pursuant to the form I–203.

{¶ 47} "With respect to appellant himself, if he had posted the $1,000 bond on the state charges, then he would have been booked on the federal I–203, which Lieutenant Manley confirmed was in his file, and would continue to be held for

pick-up by ICE agents. At that point, he would no longer be a state prisoner but a federal detainee. The sheriff's office has no ability to determine the legality of a detainer placed by ICE and does not do any independent investigation.

{¶ 48} "During the hearing the sheriff acknowledged that he should have allowed appellant to post his bond, even though he would thereafter have been either detained on the form I–247 or booked on the form I–203. To the extent that appellant challenged such detention, however, the court denied any relief, as the issues were within the jurisdiction of the federal government." Id. at 592.

{¶ 49} The appellate court in *Ricketts* went on to note:

{¶ 50} "Once appellant posts bond on his state charges or his state sentence expires, * * * * he will be 'released' from state custody and then booked on the federal immigration detainer. At that point, the sheriff will not be holding appellant pursuant to state authority but pursuant to federal authority, and the legality of the detainer and the process by which he is held will be a question for the federal courts. The trial court did not err in denying habeas relief." Id. at 593.

{¶ 51} The basis for this holding is that "a state court cannot adjudicate the validity of the federal detainer, as the area of immigration and naturalization is within the exclusive jurisdiction of the federal government." Id. at 593, citing *Plyler v. Doe* (1982), 457 U.S. 202, 225, 102 S.Ct. 2382, 72 L.Ed.2d 786, and *DeCanas v. Bica* (1976), 424 U.S. 351, 354, 96 S.Ct. 933, 47 L.Ed.2d 43 ("Power to regulate immigration is unquestionably exclusively a federal power").

{¶ 52} The record in this case is sparse, but the format in *Ricketts* appears to be the procedure that was followed. See also 8 C.F.R. 287.7(a), which provides:

{¶ 53} "Any authorized immigration officer may at any time issue a Form I–247, Immigration Detainer–Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible."

{¶ 54} 8 C.F.R. 287.7(d) further provides, "Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department."

{¶ 55} When Chavez was released on his own recognizance, he became a federal detainee pursuant to the immigration detainer. Under federal regulation, the Clark County Sheriff's Office was required to hold Chavez for 48 hours to allow ICE to assume custody. Chavez's affidavit indicates that he was held in state custody for approximately 48 hours after the trial court released him on his own recognizance. If Chavez wished to challenge his detention, the proper avenue at that point would have been to file a petition in the federal courts, not an action in contempt with the state court, which did not have the power to adjudicate federal immigration issues. Whether the federal government violated Chavez's rights during the immigration process is a matter for federal, not state, courts to adjudicate. We also note that our research has failed to disclose any instances where a state, court has held an ICE or INS agent in contempt for assuming custody. We further note that defense counsel has failed to provide authority to that effect, either to the trial court or to this court.

{¶ 56} Even if the trial court had jurisdiction over the ICE agents, the court did not abuse its discretion in overruling the motion for contempt. *Pohl v. Pohl*, Montgomery App. No. 20001, 2004-Ohio-3790, 2004 WL 1588110, at ¶ 24 (contempt decisions are reviewed for abuse of discretion). The existence of a valid court order has been established, since the entry releasing Chavez on his own recognizance is in the trial court file. Chavez also established a potential violation of the order, in that the persons in charge of the Clark County Jail failed to release Chavez as directed by the court. As was noted, "a detainer does not 'hold' the accused. Instead, it declares the government's intention to seek custody in the future and requests notification before the accused is released from his or her present confinement." *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, at ¶ 15, referring to 8 C.F.R 287.7(a).

{¶ 57} Pursuant to federal regulation, the Clark County Sheriff did not have to keep Chavez in custody for more than 48 hours; it merely had to notify the government and retain Chavez for a short period of time. If the government failed to pick up Chavez within that time, a violation of the court's order would have occurred. See, e.g., *Ochoa v. Bass* (Okla.Crim.App.2008), 181 P.3d 727, 733, 2008 OK CR 11, at ¶ 18 (ordering detainees released, because ICE failed to assume custody or take action within 48-hour period, and state no longer had any authority to continue to hold prisoners).

{¶ 58} There is no indication in the case before us that ICE failed to comply with the 48-hour time limit for taking custody. However, assuming for the sake of argument that the ICE agents are nonparties who could be held in contempt for violating the court order, Chavez failed to show that ICE was aware of the court order for his release, or indeed, that ICE was aware of the current status of his criminal case when he was taken into custody.

{¶ 59} Furthermore, the Supreme Court of Ohio has held that defendants must be proven guilty beyond a reasonable doubt in cases of criminal contempt, and that "many of the significant constitutional safeguards required in criminal trials are also required in criminal contempt proceedings." *Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 251, 18 O.O.3d 446, 416 N.E.2d 610. Among the safeguards are strict adherence to "a written charge, notice to the defendant of such charge, an adversary hearing upon the issues, together with an opportunity for the defendant to be represented by counsel." *State v. Local Union 5760, United Steelworkers of Am.* (1961), 172 Ohio St. 75, 82, 15 O.O.2d 133, 173 N.E.2d 331. None of these procedures were followed in the case before us. Although Chavez sent a copy of the motion for contempt by regular mail to the Attorney General of the United States, the court's docket does not indicate that ICE or the Attorney General was served with notice of a contempt hearing.

{¶ 60} Finally, even if the matter is considered to involve civil contempt, with no requirement of intent to violate a court order, Chavez still failed to establish ICE's knowledge of the order. Therefore, even if the trial court had jurisdiction over the ICE agents, the court did not abuse its discretion in overruling Chavez's motion for contempt.

{¶ 61} Based on the preceding discussion, Chavez's first assignment of error is overruled. Because our holding is fatal to the remaining assignments of error, the second, third, fourth, and fifth assignments of error are overruled as well.[1]

### III

{¶ 62} All of Chavez–Juarez's assignments of error having been overruled, the judgment of the trial court is affirmed.

Order affirmed.

GRADY and FROELICH, JJ., concur.

---

1. {¶ a} Assignments of error two through five are as follows:

{¶ b} "The court erred by denying the appellant's motion for civil contempt since the actions of the agents of Homeland Security deprived him of equal protection of the law by illegally interfering with his right to appeal personally in his traffic case."

{¶ c} "The court erred by denying the appellant's motion for civil contempt since the actions of the agents of Homeland Security deprived him of his Sixth Amendment right to counsel by illegally removing him from the jurisdiction of the court and giving no notice as to his whereabouts."

{¶ d} "The court erred by denying the appellant's motion for civil contempt since the actions of the agents of Homeland Security deprived him of his Seventh Amendment right to a public hearing by illegally interfering with his right to appeal personally in his traffic case."

{¶ e} "The court erred by denying the appellant's motion for civil contempt since the actions of the agents of Homeland Security deprived him of his Ninth Amendment rights."