[Cite as *Schutz v. Schutz*, 2017-Ohio-695.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

| | | |
|---|---|---|
| CRYSTAL SCHUTZ, nka MILLER | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 2016-CA-6 |
| | : | |
| v. | : | Trial Court Case No. 10DIS857 |
| | : | |
| ASHLEY SCHUTZ | : | (Appeal from Domestic Relations |
| | : | Court) |
| *Defendant-Appellee* | : | |
| | : | |

. . . . . . . . . .

# O P I N I O N

Rendered on the 24th day of February, 2017.

. . . . . . . . . .

CRYSTAL SCHUTZ, nka MILLER, 1417 East Market Street, Logansport, Indiana 46947
        Plaintiff-Appellant-Pro Se

JEREMY M. TOMB, Atty. Reg. No. 0079554, 124 West Main Street, Troy, Ohio 45373
        Attorney for Defendant-Appellee

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** This case involves a pro se appeal from an order finding Appellant, Crystal Schutz nka Miller ("Crystal") in contempt and changing custody of the parties' two minor children, A.S. and E.S. from Crystal to Appellee, Ashley Schutz.[1]

**{¶ 2}** In support of her appeal, Crystal contends that the trial court abused its discretion by finding a change of custody was in the children's best interests and by accepting the testimony and report of the Guardian ad Litem ("GAL") when the GAL's report fell below minimum standards in Sup.R. 48(D)(13). In addition, Crystal argues that the trial court erred by failing to find Ashley in contempt, by finding her in contempt, and by ignoring the testimony of Crystal's expert witness. Finally, Crystal contends that the trial court erred by imputing income to her for purposes of child support and with respect to interim orders that it entered.

**{¶ 3}** After reviewing the record, including the transcript of the two-day evidentiary hearing, we conclude that Crystal's assignments of error are without merit. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 4}** The parties to this case separated in March 2010, and their divorce decree was granted in January 2011. While the divorce was pending, Ashley and Crystal parented the children on an equal-time basis. The separation agreement, which was incorporated in the final decree, designated Crystal as legal custodian and residential

---

[1] For convenience, we will refer to the parties by their first names, and for privacy will refer to the parties' minor sons by their initials.

parent, but awarded no child support due to the fact that the parties were equally sharing the children's care. The agreement further provided that each party was entitled to complete information/records from doctors and other providers, and to complete information from any teachers, school officials and copies of all reports pertaining to the children. Each party was also required to keep the other fully advised of all school events/activities. At the time, both parties were residing in the same area, but the decree also stated that if Crystal relocated outside Versailles, Ashley would be entitled to the Darke County Standard Order of Visitation.

{¶ 5} The agreement also provided that the parties would discuss and cooperate on matters relating to their children's welfare, health, and education, "realizing that their general welfare is of paramount importance. To that end, each party will encourage the other to respect, honor, and love the other party." Doc. #3, Separation Agreement, p.3.

{¶ 6} Crystal remarried about a month after the divorce decree was entered, and then filed a notice of intent to relocate to Union, Indiana, in March 2011, based on her new husband's employment. This initial move was about an hour away from Ashley.

{¶ 7} In October 2012, Crystal filed another notice of intent to relocate to Logansport, Indiana, again based on her husband's employment. Shortly thereafter, Ashley filed a motion for reallocation of parental rights and for temporary and permanent custody of the children. The motion alleged that due to the distance, Ashley was unable to exercise parenting time without a six-hour roundtrip with the children. There were also concerns about Crystal's removal of the children from school. The motion further alleged that after Ashley had learned about the removal, he had convinced Crystal to place A.S. back in public school. However, she refused to enroll E.S. in public school. At the time,

the children were ages six and five, respectively.[2]

{¶ 8} Ashley expressed concern about E.S's ability to develop social skills, and about whether E.S. was receiving physical therapy, occupational therapy, and speech therapy. In addition, Crystal allegedly had refused to provide Ashley with information about the children's schools, academic progress, or pediatric appointments.

{¶ 9} In July 2013, the parties filed an agreed entry maintaining Crystal as residential parent and legal custodian. During the school year, Ashley was to have parenting time pursuant to the county's standard schedule, and during the summer, the parties would exercise parenting on alternating weeks. Ashley was also ordered to pay child support. The entry further provided that all prior orders would remain in effect unless otherwise modified.

{¶ 10} Subsequently, on March 20, 2015, Ashley filed a motion for contempt against Crystal, alleging that she had interfered with his visitation and had alienated his parenting time without his consent. The same day, Ashley filed a motion for custody or in the alternative, a motion to modify parenting time. In the motion, Ashley alleged that the children were being home-schooled and that it was in their best interest to receive educational training by professionally trained and certified educators, particularly since E.S. had special needs. Ashley further alleged that E.S.'s therapy was currently unknown, that he had reason to believe the children were not getting the care and attention they needed, and that Crystal had been unilaterally altering his parenting time.

{¶ 11} The trial court set a hearing on the contempt motion and appointed the

---

[2] A.S. was born in December 2007, and E.S. was born in June 2007. E.S. had been diagnosed with autism.

same GAL who had been appointed in connection with the parenting motion filed in 2012. In July 2015, Crystal filed a motion to increase child support, and for contempt, based on Ashley's alleged failure to reimburse her for expenses. The trial court set a hearing for October 13, 2015, and, after taking testimony, continued the hearing to November 2, 2015, where additional testimony was received. At the hearings, the magistrate heard testimony from the following witnesses: Crystal; Cary Miller (Crystal's husband); Ashley; Danielle Schutz (Ashley's wife); Melissa Johnson, the director of Engaging Minds (a therapy center E.S. attended); and Camille Harlan, the GAL (who recommended that custody of the children be granted to Ashley).

{¶ 12} In December 2015, the magistrate issued a decision and order recommending that custody be changed to Ashley. Among other things, the magistrate found that Crystal had not encouraged Ashley's relationship with the children and had not provided Ashley with basic information he needed as a parent, such as her decision to home-school them and to change E.S.'s therapy providers without telling Ashley. The magistrate additionally found that Crystal had failed to provide information to Ashley about therapy so that both homes provided similar environments for E.S., and that this was not in E.S's best interest. Furthermore, the magistrate concluded that the children had not adjusted to their school or community, were isolated in their mother's home, and that all their extended family (maternal and paternal) resided in Ohio.

{¶ 13} The magistrate also found Crystal in contempt for failure to permit parenting time as ordered, but ordered no sanctions. Finally, the magistrate overruled Crystal's contempt motion.

{¶ 14} Crystal filed objections to the magistrate's decision, and filed supplemental

objections after the transcript was filed in May 2016. In the meantime, on February 2, 2016, the trial court granted Ashley's motion to implement the magistrate's order on an interim basis. The trial court concluded that effective February 5, 2016, Ashley would be designated as the residential and custodial parent. Ashley was directed to promptly enroll the children in a traditional school setting and notify Crystal. He was also ordered to promptly arrange for therapy as recommended by the school and other therapists, and to notify Crystal. Crystal was given standard parenting time with certain extended intervals in the summer, and was designated as the child support obligor. The parties were also ordered to sign up for the Family Wizard software.

{¶ 15} On March 28, 2016, Crystal filed a motion to vacate the interim order, based on the contention that it had expired. The trial court overruled the motion in April 2016, stating that the court had anticipated the objection process would be completed more expeditiously and had inadvertently not extended the interim order after 28 days. The court concluded that it was not in the children's interest to be moved back and forth between their parents' homes multiple times while objections were pending, and imposed the same order as before. The court again extended the same order on its own motion in May 2016.

{¶ 16} On June 28, 2016, the trial court overruled Crystal's objections to the magistrate's decision, and adopted the magistrate's decision as its order. Crystal then appealed, pro se, from the trial court's decision.

## II. Change of Circumstances

{¶ 17} Crystal's First Assignment of Error states that:

The Trial Court Erred and Abused Its Power in Finding a Change of Circumstance Warranting a Reallocation of Custody and Determining It Is in the Best Interest of the Minor Children that Defendant Be Awarded Custody.

{¶ 18} Under this assignment of error, Crystal contends that there was no change of substance that would merit alteration of custody. As pertinent to this case, R.C. 3109.04(E)(1)(a) provides that:

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

* * *

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶ 19} The Supreme Court of Ohio has said that a substantial change of circumstance is not required under this statute. Instead, "there must be a change of circumstances to warrant a change of custody, and the change must be a change of

substance, not a slight or inconsequential change." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). The court further stressed that "[i]n determining whether a 'change' has occurred, we are mindful that custody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have wide latitude in considering all the evidence before him or her * * * and such a decision must not be reversed absent an abuse of discretion." (Citation omitted.) *Id.*

{¶ 20} "An abuse of discretion means that the trial court's decision is unreasonable, arbitrary or unconscionable." *Miller v. Remusat*, 2d Dist. Miami No. 07-CA-20, 2008-Ohio-2558, ¶ 32, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 21} In reviewing trial court decisions, appellate courts must also give deference to a trial court's findings, because " 'the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Davis* at 418, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 22} Crystal argues that no change of substance occurred because the children performed academically, were happy, maintained good relationships with siblings, and had good relationships with their parents. The magistrate and trial court found a change of circumstances based on the children's change from public schooling to home schooling; the change in E.S.'s autism counseling; A.S.'s changing mental health issues and socialization circumstances; and "continuing and increasing relationship difficulties between the parties which frustrate effective parenting." Judgment Entry – Plaintiff's Objections to Magistrate's Decision, Doc. #132, pp. 2-3. There is more than ample

evidence in the record to support the trial court's decision.

{¶ 23} When the parties were divorced in 2011, parenting time was on an essentially equal distribution, but this was disrupted by Crystal's move to Indiana. After Crystal moved, a pattern of lack of communication and unilateral decision-making on her part developed. When Ashley filed a motion about these matters in 2012, the GAL (who was the same one appointed for the 2015 motion) recommended that the children continue to stay with Crystal. The GAL testified at the 2015 hearing that her prior recommendation was based on the fact that Crystal had recently moved to Logansport, Indiana, had enrolled A.S. in public school, and was going to enroll E.S. in public school when he was eligible. In addition, E.S. had not previously had therapy for his autism, and had just begun therapy three days a week at Hopebridge. This was a provider recommended by the Riley Child Development Center, Indiana University Hospitals, where E.S. was evaluated and diagnosed as having an autistic spectrum disorder in November 2012. Hopebridge was fully paid for through insurance and Medicaid.

{¶ 24} Consistent with the GAL's recommendation, an agreed entry was filed in July 2013 designating Crystal as the residential parent and legal custodian, and providing Ashley with the county's standard order of parenting time during the school year. After that time, Crystal made many decisions that detrimentally affected the children without consulting or even notifying Ashley, and the lack of communication about the children's educational and medical situations exacerbated. As one example, after the 2013 proceedings, Ashley agreed to follow a gluten-free, casein-free, no sugar, no red dye diet for E.S. if he could speak to E.S.'s doctor. E.S. had been placed on this diet without Ashley's knowledge or consent. At the meeting with the doctor, Crystal became upset,

called Ashley a "sperm donor," and flipped him off. These actions took place while E.S. and A.S. were present. Crystal also admitted that she may have called Ashley a "jerk" at times in front of her children, although she said she did not "routinely" do so. In addition, Crystal reported Ashley's employer to the Better Business Bureau after a delay in processing a child support payment, and this caused him problems at work.

{¶ 25} Furthermore, Crystal removed A.S. and E.S. from public school and placed them in an online public school program that was conducted at home. Again, this decision was made without Ashley's knowledge or consent. The GAL noted that this was done primarily to accommodate E.S.'s therapy and Crystal's schedule. According to the GAL, Crystal told her that she was overwhelmed by having A.S. in a regular public school, by having E.S. on a split schedule between public school and therapy, and by having two younger children, all with no support system.

{¶ 26} The GAL's statements were buttressed by Crystal's testimony, which indicated that, prior to Crystal's decision to begin home schooling, E.S. had begun public school (in a brick and mortar setting), and was doing fine in school. At that time, Crystal would send A.S. and E.S. to public school on the bus at 7:00 a.m. She would then pick up E.S. at 11:00 a.m. to take him to Hopebridge, which was a half hour away, for therapy. She would wait for E.S. to finish therapy and rush back to beat the bus home for A.S. Crystal had two other small children from her second husband (a daughter born in November 2011 and a son born in February 2014), who had to be transported to these sessions. Crystal had no family support in the area.[3]

---

[3] Both the paternal and maternal grandparents, as well as most other family relatives, live in the area where Ashley lives, which is about three hours away from Crystal's home in Indiana.

**{¶ 27}** In December 2014, Crystal also switched E.S. from Hopebridge to another therapy provider, Engaging Minds ("EM"). EM was a facility that was not fully covered by insurance and did not qualify for reimbursement from Medicaid. Crystal did not discuss the change in providers with Ashley, nor did she notify him that it had occurred.

**{¶ 28}** Any information that Ashley was able to obtain about the children's schooling or medical situations required a process of applying to court for subpoenas or learning after the fact about events from his children. For example, A.S. received a severe burn while making breakfast for the children while Crystal was sleeping. Crystal did not notify Ashley about this; he only learned of it when A.S. came for parenting time and was panicked because he had forgotten his burn cream.

**{¶ 29}** The following exchange describes Crystal's attitude toward providing Ashley with any information about their children:

> Q. Okay. Do you think that it's in your children's best interest for you to forward information about their treatment and their education to their father?
>
> A. I believe I already answered that.
>
> Q. What's your answer.
>
> A. My answer is that if he wants the information, he should obtain it.
>
> Q. Here's where our disconnect is. The disconnect is I'm not asking anything about your personal relationship. This Court is going to make a decision solely based upon the best interest of your children not based upon your communications, not based upon what he should do or

what you should do.

So what I'm asking is in the best interest of your children, do you not think that it would be beneficial for you to send that information to Ashley?

A.  I don't have an opinion one way or the other.

Transcript of Proceedings, Vol. II, p. 442.

**{¶ 30}** The record further indicates that the children were isolated in Crystal's home, were not enrolled in extra-curricular activities, and did not have friends with whom they interacted at home.   The GAL was particularly concerned about their isolation and lack of socialization.   Accordingly, the trial court's finding of a change in circumstances is supported by a great deal of evidence, as well as by the recommendation of the GAL, who concluded that Ashley should have custody of the children.

**{¶ 31}** Under this assignment of error, Crystal further contends that even if the "best interests" test in R.C. 3109.04(F) applies due to a finding of a change of circumstances, the trial court erred by failing to consider the children's relationship with their half-siblings and the fact that Ashley was allegedly $1,800 in arrears in child support when he filed the motion for custody in March 2015.   Additionally, Crystal argues that the trial court had no evidence that Ashley was the parent more likely to facilitate support, and that the court's finding that she was inconsistent and unreliable in medical decisions was against the manifest weight of the evidence.   Crystal further argues that the trial court was precluded from considering her refusal to vaccinate E.S. and her two younger children (and thereby exposing them to multiple childhood illnesses) because it was a religious decision.

**{¶ 32}** As was noted, R.C. 3109.04(E)(1)(a) requires trial courts to find that

modification of a prior decree allocating parental rights and responsibilities "is necessary to serve the best interests of the child." R.C. 3109.04(F) states that in determining the best interest of a child, "the court shall consider all relevant factors, including but not limited to" various factors set out in R.C. 3109.04(F)(1)(a)-(j). The factors potentially pertinent to this case include:

(a) The wishes of the child's parents regarding the child's care;

* * *

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

* * *

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning

to establish a residence, outside this state.

**{¶ 33}** In its decision, the trial court placed particular reliance on R.C. 3109.04(F)(1)(c), (d), and (f), noting that "the transcript is telling regarding the Plaintiff's frequent frustration of the Defendant's parenting time and his relationship with the children, such as (1) failing to honor parenting time orders; (2) failing to communicate the children's circumstances regarding school and counseling; and (3) unilateral decision-making that reduced the Defendant's ability to support and assist the children." Judgment Entry – Plaintiff's Objections to Magistrate's Decision, Doc. #132, p. 3. The court also observed that Crystal had inconsistent medication and decision-making processes. *Id.* There is substantial evidence in the record supporting these findings.

**{¶ 34}** R.C. 3109.04(F)(1)(c) pertains to interaction with parents, siblings, and others who may affect the child's best interests. The trial court did not specifically mention the half-siblings, but the court was not required to explicitly detail a long list of persons who may or may not interact with the children and address each one. The court placed particular emphasis on the relationship of the children with their father, which Crystal had attempted to hinder. Furthermore, the record indicates that Crystal and her husband argue in front of the children and that this was a stressor for A.S., who brought it up during a counseling session; that Ashley and his wife do not argue in front of the children; that A.S. had expressed the belief that his younger sister received preferential treatment in his mother's home; that A.S. had expressed concern during counseling about his stepfather's anger; that there are no family members near Crystal; and that there are numerous family members, both paternal and maternal, in the area where Ashley lives.

Accordingly, the trial court's decision that modification of custody is in the best interests of the children is supported by more than ample evidence.

{¶ 35} In addition, the GAL noted that she had observed the children in both homes and that there was a significant difference in how E.S. acted at Ashley's home as opposed to Crystal's home. At Ashley's home, E.S. showed a dramatic improvement in his play, eye contact, and ability to communicate over when she had previously observed him. Conversely, at Crystal's home, E.S. displayed arm-flapping, lack of attention span, and lack of eye contact. The difference was so marked that the GAL asked the court for a continuance so she could again observe E.S. at his father's house. During this visit, which was much longer than the first visit to Ashley's home, the GAL's observations confirmed what she had previously seen, i.e., that E.S. showed a dramatic improvement at his father's house, but not at his mother's house.

{¶ 36} As to alleged child support arrearages or motions filed to that effect, the record does not indicate any arrearages, and Crystal did not raise this issue at trial or in objecting to the magistrate's decision. With respect to issues about which parent is more likely to facilitate visitation, the record is clear that Ashley was the parent who was more likely to do so.

{¶ 37} Finally, Crystal contends that the trial court's judgment was improperly based on her refusal to vaccinate the children for religious reasons. As Crystal notes, the Supreme Court of Ohio has issued a decision regarding a domestic relations court's consideration of religious doctrine. In *Pater v. Pater*, 63 Ohio St.3d 393, 588 N.E.2d 794 (1992), the court said that "a domestic relations court may consider the religious practices of the parents in order to protect the best interests of a child." *Id.* at 395, citing *Birch v.*

*Birch*, 11 Ohio St.3d 85, 463 N.E.2d 1254 (1984).  However, the court also stressed that "the United States Constitution flatly prohibits a trial court from ever evaluating the merits of religious doctrine or defining the contents of that doctrine."  (Citation omitted.)  The court, therefore, reversed a custody award that was based solely on a parent's religious beliefs.  *Id.* at 395-396.

{¶ 38} The case before us does not involve such a situation.  In *Pater*, the mother's religious practices were "the major issue" in the case.  *Id.* at 393.  In fact, the trial court refused to allow the mother visitation rights if she were "going to teach the child her religion [Jehovah's Witnesses] or take the child to Kingdom Hall."  *Id.* at 395.

{¶ 39} In contrast to *Pater*, the trial court did not even mention the vaccination issue in its decision.  Furthermore, while the magistrate mentioned that Ashley was concerned about the lack of vaccinations for E.S. and Crystal's younger children, the magistrate did not base her decision on this point.  As was noted, Crystal's actions regarding medications were inconsistent, and any comments on this in the magistrate's decision were simply a recounting of the testimony and perhaps an indication of lack of credibility – or inconsistency in medical decisions, not a ruling on religious preferences.

{¶ 40} Based on the preceding discussion, the First Assignment of Error is overruled.


III.   Alleged Error Regarding GAL

{¶ 41} Crystal's Second Assignment of Error states that:

> The Magistrate Erred and Abused Its Power by Accepting the Testimony of Guardian Ad Litem and Adopting the GAL's

Recommendations as the Magistrate's Order, as the Report Fell Far Below the Minimum Standards Outlined in Sup.R. 48(D)(13).

**{¶ 42}** Under this assignment of error, Crystal argues that the GAL failed to comply with Sup.R. 48(D)(13) by not meeting with Crystal and the children at Crystal's residence; by failing to contact school providers and therapists; and by failing to recommend testing that night be necessary. Crystal also argues that the GAL was biased.

**{¶ 43}** Crystal did not object at trial to the GAL's testimony, nor did she object to the GAL's alleged failure to comply with Sup.R. 48(D)(13) in her original or supplemental objections to the magistrate's decision.

**{¶ 44}** Civ.R. 53(D)(3)(b)(iv) states that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)." In such situations, we review for plain error only. *Crain v. Crain*, 2d Dist. Clark No. 2011-CA-92, 2012-Ohio-6180, ¶ 15. "The plain error doctrine permits correction of judicial proceedings when error is clearly apparent on the face of the record and is prejudicial to the appellant." (Citation omitted.) *Reichert v. Ingersoll*, 18 Ohio St.3d 220, 223, 480 N.E.2d 802 (1985). *Accord In re C.N.*, 2d Dist. Montgomery No. 27119, 2016-Ohio-7322, ¶ 55. However, use of this doctrine "is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Reichert* at 223, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶ 45}** On review of the record, we find no error on the face of the record, nor do

we find any exceptional circumstances.   Contrary to Crystal's contention, the GAL did observe the children at Crystal's home.   In addition, the GAL visited Ashley's home twice only to verify the dramatic difference between E.S. at the two residences.   The GAL also was the same guardian ad litem who had previously recommended that custody be maintained with Crystal for stability purposes when the children were enrolled in a traditional public school.   No bias appears in the record.   Furthermore, even if the GAL failed to meet and interview school personnel or medical and mental health providers as indicated by Sup.R. 48(D)(13)(g), the rule states that the GAL is to do the matters outlined in the rule "*unless impracticable or inadvisable because of* the age of the child or *the specific circumstances of a particular case * * *.*"   (Emphasis added.)

{¶ 46} In this case, the children's providers were located approximately three hours away from the court and the GAL, which would require a six-hour roundtrip for the GAL. The GAL stated that she followed the procedures she normally does in any case, although there was a little more involved in this case.   In addition to the home visits, the GAL reviewed the records provided by the attorneys, which included all discovery exchanged. Moreover, the GAL sat in for the deposition of Melissa Johnson, E.S.'s behavioral therapist from E M, and also sat through two days of trial, after which the GAL indicated that her opinion as to appropriate custody of the children (with Ashley) had not changed. The GAL's testimony showed a high level of knowledge about the case, and we find no exceptional circumstances or manifest injustice warranting the application of the plain error doctrine.   In fact, we find no error.

{¶ 47} Accordingly, the Second Assignment of Error is overruled.

IV. Contempt Finding Against Crystal

{¶ 48} For purposes of convenience, we will address the Fourth Assignment out of order. This assignment of error provides that:

The Trial Court Erred and Abused Its Power in Finding the Plaintiff in

Contempt for Violation of Orders Involving Parenting Time.

{¶ 49} Under this assignment of error, Crystal contends that the trial court's finding of contempt was an abuse of discretion because only one parenting time violation occurred, and she did not willfully violate the court's orders regarding parenting time.

{¶ 50} Courts have certain inherent powers to ensure "the orderly and efficient exercise of justice * * *." (Citations omitted). *Zakany v. Zakany*, 9 Ohio St.3d 192, 194, 459 N.E.2d 870 (1984). These powers include "the authority to punish the disobedience of the court's orders with contempt proceedings." (Citations omitted.) *Id.*

{¶ 51} "Civil contempt is a remedy whereby an aggrieved party to a lawsuit can enforce a civil remedy and thereby protect its rights. * * * A finding of civil contempt requires clear and convincing evidence that the alleged contemnor has failed to comply with the court's prior orders. * * * In order to be clear and convincing, evidence must leave the trier of fact with the firm conviction or belief that the allegations involved are true. *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118." (Citations omitted.) *Moraine v. Steger Motors, Inc.*, 111 Ohio App.3d 265, 268, 675 N.E.2d 1345 (2d Dist.1996).

{¶ 52} We review trial court orders in contempt cases for abuse of discretion. *State v. Chavez-Juarez*, 185 Ohio App.3d 189, 2009-Ohio-6130, 923 N.E.2d 670, ¶ 56 (2d Dist.). "A prima facie case of civil contempt is made when the moving party proves

both the existence of a court order and the nonmoving party's noncompliance with the terms of that order." (Citations omitted.) *Wolf v. Wolf*, 1st Dist. Hamilton No. C-090587, 2010-Ohio-2762, ¶ 4. *Accord Hoagland v. Hoagland*, 2d Dist. Miami No. 2014-CA-30, 2015-Ohio-2426, ¶ 6. "The burden then shifts to the nonmoving party to establish a defense for its noncompliance." *Wolf* at ¶ 4.

**{¶ 53}** After reviewing the record, we find that the trial court did not abuse its discretion in finding Crystal in contempt. Crystal's own testimony indicates that she made a unilateral decision to deprive Ashley of visitation and failed to communicate with him prior to making her decision to remove the children from the area. Crystal also failed to return Ashley's calls about the missed parenting time and did not permit him any communication with the minor children during the time he was supposed to have them. Crystal may have thought her reasons were justified, but as with many other situations, this was not her unilateral decision to make. Ashley was available and could have taken care of the children. In fact, this would have assisted Crystal and the children. Instead of being with Ashley, the children were required, along with their younger brother and sister, to travel several hours so that Crystal could care for her brother.

**{¶ 54}** As the trial court noted, "the transcript is telling regarding the Plaintiff's frequent frustration of the Defendant's parenting time and his relationship with the children * * *." Judgment Entry – Plaintiff's Objections to Magistrate's Decision, Doc. #132, p. 3. The denial for which Crystal was held in contempt is just one example of her unilateral and arbitrary decision-making regarding the children. In addition, no sanction was imposed against Crystal for the contempt.

**{¶ 55}** "We have previously emphasized, and stress once again, that children have

certain rights, including ' "the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important * * * the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles." ' " *Bell v. Bell*, 2d Dist. Clark No. 97-CA-105, 1998 WL 288945, *1 (June 5, 1998), quoting *Thomas v. Freeland*, 2d Dist. Greene No. 97-CA-06, 1997 WL 624331,*3 (Oct. 10, 1997).

{¶ 56} Accordingly, the Fourth Assignment of Error is overruled.

V.   Alleged Error in Failing to Find Ashley in Contempt.

{¶ 57} Crystal's Third Assignment of Error states that:

The Trial Court Erred and Abused Its Power by Failing to Find the Defendant in Contempt for Unpaid Medical Bills, Failure to Cooperate on Matters Relating to the Children's Welfare, Health, and Education, and Not Taking the Minor Child, [E.S.], to Therapy.

{¶ 58} Under this assignment of error, Crystal contends that the trial court abused its discretion by failing to find Ashley in contempt for failing to pay for therapy bills, for failing to take E.S. to therapy as required, and for failing to follow doctor's orders regarding diet and medication administration.

{¶ 59} Again, we apply the standards recited above regarding contempt, including that we review the trial court's decision for abuse of discretion.   Based on our review of the record, this assignment of error has no merit.   More importantly, the magistrate found that Crystal did not come to court with clean hands.   We agree.

{¶ 60} We have noted that " '[t]he clean hands doctrine is not a stranger in domestic relations.' " (Citation omitted.) *Gambill v. Gambill*, 2d Dist. Miami No. 89-CA-70, 1991 WL 10958, *2 (Jan. 31, 1991). "The unclean hands doctrine generally provides that when a party takes the initiative to set in motion a judicial action in order to obtain some remedy, the court will deny the remedy where the party seeking it has acted in bad faith by his or her prior conduct." (Citation omitted.) *Gardner v. Bisciotti*, 10th Dist. Franklin No. 10AP-375, 2010-Ohio-5875, ¶ 15.

{¶ 61} As was noted, Crystal made many unilateral and arbitrary decisions about the children without notifying Ashley or providing him an opportunity to express a position. Crystal also attempted to obstruct Ashley's access to information about the children, to the point that he had to subpoena documents to find out anything.

{¶ 62} Crystal's testimony at the hearing indicated that she had not yet paid any therapy bills from EM, and there was a question whether payment would even be required. Additionally, she unilaterally chose this provider, who was not covered by Medicaid, without any input from Ashley. Crystal's testimony also indicates that due to issues with the therapy providers (not with Ashley's willingness to schedule), compliance with scheduling therapy in Ohio was impossible prior to the time that Ashley was given custody. Basically, the Indiana and Ohio providers would not provide therapy if another therapy provider was involved, and the Indiana therapist was the first one to render services to E.S.

{¶ 63} Finally, with respect to diet and medication, the evidence indicated that Crystal chose to place the children on a gluten-free, sugar-free diet, again without consulting Ashley or without having medical indications that this was necessary. In

addition, the undisputed testimony was that Crystal was not following the diet, having permitted E.S. to eat candy, and A.S. to drink soda while in her care.

{¶ 64} It is true that Ashley had reservations about giving A.S. Strattera medication for A.S.'s alleged ADHD. However, the GAL testified that she could find no evidence in the record of a therapist having diagnosed A.S. with ADHD. The GAL recommended that comprehensive testing should be done to verify what appeared to have been Crystal's own self-diagnosis of a condition that Ashley disputed. Again, Crystal's choice to keep Ashley in ignorance of the children's medical providers and records was a preceding factor. Ashley and his wife (who is a registered nurse), both testified that they did not observe any signs of ADHD in A.S., and that they were reluctant to administer a medication that appeared to cause seizures. Ashley also asked for a neurological examination to verify a diagnosis, and Crystal had not complied with this request as of trial. These concerns are documented in the record, and the trial court could properly choose which party's testimony to credit.

{¶ 65} In this context, we note Crystal's recitation of the magistrate's finding that the parties' separation agreement provided that they were to discuss and cooperate on all matters relating to their children's welfare, health, and education. Brief of Appellant, p. 11. According to Crystal, "[a]s the appellant [Crystal] was the custodial parent, this afforded her the rights to make the medical and educational decisions. The appellee [Ashley] had no choice but to then cooperate on all matters per the agreement." *Id.*

{¶ 66} This is an incorrect interpretation of the agreement. The agreement does not give the residential and custodial parent the right to make unilateral decisions about a child and then hold the other parent in contempt when that parent happens to disagree.

A requirement to "discuss" is the antithesis of unilateral decision-making. "To cooperate means 'to act or work with another or others; to associate with another or others for mutual benefit.' " *Wiseman v. Wiseman*, 9th Dist. Medina No. 13CA0009-M, 2014-Ohio-2002, ¶19, quoting *Merriam–Webster's Collegiate Dictionary* 275 (11th Ed.2003). "[C]ooperation is a two-way street designed to arrive at a place that benefits both parties, not merely one party at any cost to the other." *Id*.

**{¶ 67}** Having failed to involve Ashley in any decision-making regarding the children, Crystal does not come to court with "clean hands" to request that he be held in contempt for his disagreement with her decisions.

**{¶ 68}** Accordingly, the trial court did not err in refusing to find Ashley in contempt, and the Third Assignment of Error is overruled.

## VI.   Expert Testimony

**{¶ 69}** Crystal's Fifth Assignment of Error states that:

> The Trial Court Erred and Abused Its Power by Ignoring the Testimony of the Expert Witness.

**{¶ 70}** Under this assignment of error, Crystal contends that the trial court erred in failing to credit the testimony of her expert, Melissa Johnson, who had concerns about E.S.'s participation in a traditional school environment. According to Crystal, the court further erred in requiring the children to be enrolled in a traditional brick and mortar school without considering Johnson's testimony or without having any evidence that the change to home-schooling was detrimental.

**{¶ 71}** Based on our discussion of the other assignments of error, there was ample

evidence that the change to online home schooling was detrimental to the children. Crystal testified that E.S. (the child with autism) had been enrolled in public school and that he was doing fine there before she chose to remove him and A.S. to a home-school environment. The change was made primarily to accommodate Crystal's schedule and to accommodate E.S.'s therapy schedule. Despite Crystal's refusal to acknowledge that A.S.'s grades suffered after he was removed from public school, a fair reading of the evidence in the record indicates that his grades worsened. In addition, both boys were isolated in their mother's home, and the GAL expressed concern about their socialization and how it was being stunted by the lack of socialization.

{¶ 72} Notably, the credibility of expert witnesses and the weight to be given to their testimony are matters "for the trial court, as the trier of fact, to determine." *Vance v. Vance*, 151 Ohio App.3d 391, 2003-Ohio-310, 784 N.E.2d 172, ¶ 100 (2d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). After considering the record, we find nothing improper in the trial court's decision.

{¶ 73} Melissa Johnson was certified in applied behavioral analysis ("ABA"), which is a widely accepted technique used in dealing with individuals with autism. Johnson acknowledged in her testimony that her certification and ABA were not education-related, that she had no educational background, and that she had no opinion as to whether home school or public school would be the best place for E.S. Transcript of Proceedings, Vol. II, p. 309. Johnson did say that she thought E.S. would struggle if he were in a public school setting and was unassisted. She stressed that what was most important was that E.S. continue to receive ABA therapy.

{¶ 74} The GAL, who had observed E.S. over a number of years, expressed

confidence that E.S. could attend public school and be mainstreamed. She also stated that the Ohio school system in which E.S. would be enrolled followed the same ABA techniques for autism that E.S.'s private provider in Indiana did. Transcript, Vol. II, at pp. 464-470. According to the GAL, the school system in Ashley's locale would do an IEP for E.S. and then make recommendations for physical therapy, occupational therapy, and speech therapy. E.S. would be in a general classroom for part of the day and would be outside the classroom for his therapies. The GAL agreed that E.S. would probably not be able to succeed in public school without assistance; the GAL stressed, however, that the type of assistance that Johnson mentioned was provided by the public school district in Ohio where E.S. would be enrolled if Ashley were given custody.

**{¶ 75}** In view of the above testimony, the trial court did not err by failing to rely on the expert testimony. The court's decision was consistent with the evidence, which indicated that E.S. would benefit from the socialization of a general public school classroom, while receiving the ABA therapy that he needed.

**{¶ 76}** Accordingly, the Fifth Assignment of Error is overruled.


### VII. Imputation of Income

**{¶ 77}** Crystal's Sixth Assignment of Error states that:

> The Trial Court Erred and Abused Its Power by Imputing Income to
> the Plaintiff for Purposes of Calculating Child Support and Requiring Plaintiff
> to Pay Child Support and by Not Using the Actual Income of the Defendant.

**{¶ 78}** Under this assignment of error, Crystal argues that the trial court erred in imputing income to her because she allegedly submitted an affidavit indicating that she

was receiving means-tested income. Crystal did not raise this issue in the trial court, and again, we review only for plain error. *Crain*, 2d Dist. Clark No. 2011-CA-92, 2012-Ohio-6180, at ¶ 15. As we noted, use of the plain error doctrine "is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Reichert*, 18 Ohio St.3d at 223, 480 N.E.2d 802.

{¶ 79} Our review of the record reveals no exceptional circumstances that would warrant application of the plain error doctrine, nor have we found any error. In this regard, R.C. 3119.05(I) provides that:

Unless it would be unjust or inappropriate and therefore not in the best interests of the child, a court or agency shall not determine a parent to be voluntarily unemployed or underemployed and shall not impute income to that parent if either of the following conditions exist:

(1) The parent is receiving recurring monetary income from means-tested public assistance benefits, including cash assistance payments under the Ohio works first program established under Chapter 5107. of the Revised Code, financial assistance under the disability financial assistance program established under Chapter 5115. of the Revised Code, supplemental security income, or means-tested veterans' benefits * * *.

{¶ 80} The record fails to indicate that Crystal has been receiving monetary income from means-tested public assistance benefits or from any of the other programs listed. Crystal did not mention this issue in the affidavit of income she filed when she asked for an increase in child support, and the record indicates that her husband is gainfully employed at an Indiana State hospital. Crystal had been previously employed,

and there appears to be no reason why she could not work, other than her choice to stay at home. Furthermore, Crystal's husband testified that Crystal owns a property in Versailles for which she receives rent. Although he claimed not to know the amount of the rent, it is clear that Crystal receives some income from the rental, and again, no evidence was submitted to indicate that she was receiving monetary income under any programs mentioned in R.C. 3119.05(I). Given these facts, the trial court did not commit plain error or any error in crediting Crystal with a minimal amount of income for child support purposes. Specifically, Crystal was credited only with a minimum wage amount and is paying only $210.30 total per month, plus 2% poundage, for her two children.

{¶ 81} Based on the preceding discussion, the Sixth Assignment of Error is overruled.

## VIII. Interim Orders

{¶ 82} Crystal's Seventh Assignment of Error states that:

The Trial Court Erred and Abused Its Power by Extending the Interim

Order for an Indefinite Amount of Time After Its Expiration, Failing to Vacate

the Order and Issuing New Interim Orders Without Good Cause Shown.

{¶ 83} Under this assignment or error, Crystal contends that the trial court erred in failing to comply with requirements for extending interim orders. In response, Ashley argues that there may have been a technical violation, but that any technical delay is not an abuse of discretion when the delay is caused by the complaining party's failure to have the transcript filed in the trial court. In addition, Ashley argues that once a final order is entered, any error is harmless.

{¶ 84} Civ.R. 53(D)(4)(e)(ii) provides that:

The court may enter an interim order on the basis of a magistrate's decision without waiting for or ruling on timely objections by the parties where immediate relief is justified. The timely filing of objections does not stay the execution of an interim order, but an interim order shall not extend more than twenty-eight days from the date of entry, subject to extension by the court in increments of twenty-eight additional days for good cause shown.

{¶ 85} The record indicates the delay in entering a second interim order was due to the fact that the transcript was not filed as expeditiously as the trial court anticipated. When the order's expiration was brought to the court's attention, it noted the delay, and entered another order. Crystal did not thereafter object (the third interim order, which the trial court entered on its own motion, was also entered more than 28 days after the second order.)

{¶ 86} Courts have refused to address errors pertaining to the entry of interim orders, finding any error moot, because such orders terminate when the trial court enters final judgment. *See Nolan v. Nolan*, 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, ¶ 19; *In re Guardianship of Smith*, 2d Dist. Clark No. 2011-CA-09, 2011-Ohio-6496, ¶ 20; *Carter v. Carter*, 3d Dist. Wyandot No. 16-99-02, 1999 WL 955909, *5 (Oct. 20, 1999). We agree with the cited cases, and find that the Seventh Assignment of Error should be overruled as moot.

IX. Conclusion

**{¶ 87}** Six of Appellant's assignments of error having been overruled, and the Seventh Assignment of Error having been overruled as moot, the judgment of the trial court is affirmed.


. . . . . . . . . . . .


FROELICH, J. and HALL, J., concur.


Copies mailed to:

Crystal Miller
Jeremy M. Tomb
Hon. Jonathan P. Hein